# Atkinson Estate

*Jerome B. Apfel,* for accountant.

*John F. Meigs* and *Edward M. David,* for *Franklin Atkinson Allen,* claimant, and *Lillian G. Allen,* personal representative.

Theodore W. Flowers, trustee ad litem.

*Mark N. Steinberger and Richard W. McConaghy,* for *Theodore W. Flowers.*

*Marvin I. Block,* for Commonwealth of Pennsylvania.

JAMISON, *J.*, December 30, 1981—The first and partial account of the administrator was confirmed nisi, on April 11, 1979, and the amount of $430,098.74 was awarded back to the administrator. Questions remained as to settlements on decedent's income and Federal estate taxes with the Internal Revenue Service, negotiations respecting recovery of the proceeds of over $400,000 in securities which had been stolen from decedent's home, and issues respecting entitlement to distribution. There also remained questions concerning the conduct of the genealogist or heir hunter in the administration of this estate in which decedent died without known heirs.

On November 16, 1977, the body of Harold Atkinson was discovered in the house in Philadelphia in which he had resided for some 50 years. No will was found. It was apparent, however, to investigators from the medical examiner's office that decedent, who had probably died of natural causes, was an eccentric recluse, who had substantial assets. Atkinson's body was removed[1] to the medical examiner's office where it remained unclaimed for about a month. When no one claimed Atkinson's body, the register of wills, having been notified of the death on December 16, 1977, appointed Joseph F. Moore, Jr., Esq., to administer the estate and granted letters of administration to Mr. Moore on December 20, 1977. On the same day, the administrator engaged counsel designated by the register of wills.

"Very early in the administration," the administrator called Herbert U. Davis, an heir searcher, advised him of the Atkinson estate, particularly

---

1. Atkinson's securities were removed by certain members of the police force. The saga of the thefts, scams, trials and recoveries is set forth in Volume I of the Notes of Testimony and in contemporaneous newspaper reports which are part of this file.

that there were no known or locatable heirs, and requested his assistance in locating an heir. Shortly thereafter, and before the end of 1977, Jerome Apfel, Esq., head of the Estates Department of the firm with which the designated counsel was associated, met with Mr. Davis and asked him to make efforts to locate possible heirs. Counsel provided Davis with various documents, including some very old letters and a monograph written at the turn of the century by decedent's mother in regard to certain real estate grievances.

Counsel stated he did not "retain" Mr. Davis. He testified that he attempted to engage Mr. Davis and pay a fee for his services, but when Davis declined, counsel "started him on a search" which he (Davis) preferred to do on his own. "(I)f he were successful, he would make appropriate arrangements with any heir or heirs." Thereafter, Davis met with counsel and informed him that he was engaged in an extensive investigation both in the United States and in England. Also, whenever the existence of other possible heirs was suggested, counsel for the administrator recalled, ". . . on each occasion the claimants . . . were referred to Mr. Davis, who investigated what they had to say and got back to them and had direct discussions with them."[2]

In late January or early February, 1978, less than two months after the grant of letters, Mrs. Franklin A. Allen received a telephone call at her home in St. Petersburg, Florida, from Mr. Davis. Davis stated that he was calling from Philadelphia and asked to speak to Mr. Allen. He asked if Mr. Allen's name was Franklin A.; was informed that Mr. Allen's

---

2. Other assistance was provided Mr. Davis by the administrator. He informed him of certain information known to a newspaper woman in Coatesville, Pa., and drafted an affidavit which was executed and given by the administrator to Mr. Davis.

middle name was Atkinson and that he was from Philadelphia. He also inquired about Robert Atkinson and whether Robert had married someone named Lillico. Mr. Davis then told Mrs. Allen, "There is an inheritance from an Atkinson, and I have been looking around to find the right next of kin. I think that I have found him, but would like to come down and see you to make sure, to ask him a few questions." Mrs. Allen informed Davis that she was not interested—that she would sign nothing and that Davis should not come down. Mrs. Allen did say that she would talk it over with her husband and suggested that Davis call her back in about a week. Davis called a week later. Mrs. Allen again stated that she was not interested but that Davis could call again. When Davis called a third time, he spoke to Mr. Allen. Arrangements were made to meet at the Tampa airport on February 20, 1978.

On that date, Mr. and Mrs. Allen met with Mr. Davis at the Tampa airport for two or three hours. According to Mrs. Allen, Davis told Allen that he was not sure Allen was the heir, that there could be others, and additional work had to be done. Davis said, "I am willing to represent you if you want me to, and I will make a contract with you. If you are willing to sign a contract, I will do this work for you and I won't charge you one penny, but if I do, then I get paid so much from the estate." The amount of the inheritance had not been discussed. Mr. Davis displayed a part of a family chart. Mr. Allen recalled: "Mr. Davis tried to talk me into this thing . . . So he finally said, 'Well, there is some money involved here.' I said, 'How much?' 'It looks like six figures.'[3] I said, 'Give me the paper. I'll sign it.'".

---

3. We can surmise that this information had been supplied to Davis either by the administrator or his counsel.

Earlier, Davis told Mr. Allen that "(i)f I didn't sign, that was it." Mr. Allen believed that if he did not sign, Davis would not have told him the name of the person from whom he would inherit. Mr. Allen signed two copies of the contract before a Notary Public in the airport. Mrs. Allen did not sign.

The "agreement," dated February 20, 1978,[4] reads as follows:

In consideration of the agreement of Gwirtz-Davis Genealogical Service, a corporation, to provide me with information with respect to certain assets in which I may have an interest, arising from the above source, and in consideration of your agreement to continue your efforts and investigation to determine the extent thereof through genealogical research, I, for mysef, and my heirs, executors, administrators, and assigns, herewith and hereby assign and grant to you an undivided twenty-five (25%) percent interest in every portion of the said property or assets to which I may be entitled, and I hereby agree to cooperate fully with you in this matter.

It is understood that in the event I receive nothing from the abovementioned property and assets, I shall not be under any obligation to you under this agreement.

I understand that you are not undertaking to do any legal work whatsoever, and that I am to employ an attorney of my own choice to represent my interest in this matter, whose fee shall be paid by me.

Mr. Allen testified that he understood the agreement's terms to include 25 percent. He had no understanding of any other detail beyond 25 percent.

---

4. One copy was kept by Mr. Davis and one copy given to Mr. Allen.

Mr. Allen stated that when he read the contract, he learned for the first time that Harold Atkinson was the person who had died from whom he might get some money. Mr. Allen testified that, "As soon as I signed it," Mr. Davis told him he was reasonably certain he had money out of the Atkinson Estate.

With respect to his selection of counsel, Mr. Allen testified that Davis asked, "Don't you think you should have an attorney?" Allen agreed he should, whereupon Davis "wrote three names down on a piece of paper", from which Allen selected Mr. John Meigs, as in a "lottery."[5]

According to Mrs. Allen, "We did say we would take Mr. Meigs for a lawyer, at the airport." Mr. Davis "wrote three names down on a piece of paper and he handed them to (Mr. Allen). He said, 'Now

---

5. In other cases Davis has recommended only one lawyer. Thus, in Estate of Elizabeth Fontaine, No. 2568 of 1978. (C. P. Phila., O.C. Div.), Davis wrote to the heirs:

Several members of the family have asked me to recommend counsel to represent your interest in this matter in Philadelphia. At their request, we have discussed this estate and your possible inheritance from it with (named lawyer and address). Mr. (lawyer) is a very competent probate attorney who would be willing to represent you on a 5 percent contingent basis, if you decide to employ him. We will reduce our fee of 33⅓ percent by 5 percent which means that we will now receive 28⅓ percent, and your attorney will receive 5 percent, and you will still be entitled to 66⅔ percent of the amount you are awarded. Of course, you are free to employ an attorney of your own choice. However, I am not able to reduce my fee more than 5 percent. Obviously, it is to your advantage for all of you to employ the same attorney, and you do need counsel Philadelphia to represent you. We shall obtain all of the other necessary certified records here to establish your relationship to the decedent, and prepare the genealogical chart, all of which will be sent to the attorney.

take whichever one you want.' So Frank said, 'Well, how about John Meigs?' He said, 'If you want him, that's all right, anyone you want.'"

On his return to his home, Mr. Allen telephoned Mr. Meigs and later wrote to him. Mr. Meigs agreed to take the case. Mr. Allen arranged to pay his counsel "(f)ive percent of what I received," and he "would receive nothing" in the event Allen did not receive anything.

In April, 1979, after the court hearing at which Mr. Davis had testified to establish Mr. Allen's relationship to decedent, Mr. Meigs telephoned Mr. Allen relative to what became Court Exhibit 2, an affidavit dated April 16, 1979, reading in pertinent part as follows:

I FRANKLIN ATKINSON ALLEN, being duly sworn according to law, depose and say the following:

1. I am the first cousin of the decedent Harold Atkinson, also known as Harry Barnes, also known as Lillicu H. Atkinson. I had not seen Harold Atkinson for over half a century and had totally lost track of him long before Mr. Herbert U. Davis of Gwirtz-Davis Genealogical Service Company contacted me.

2. I entered into a contract with Gwirtz-Davis Genealogical Service Company under the terms of which they are to receive a portion of whatever I recover from the Estate of Harold Atkinson. I am a college graduate, and a retired engineer, and I have determined that the contract is a fair and reasonable one and I intend to pay Gwirtz-Davis whatever they are entitled to receive under that contract. *I object to any efforts by any Court to take up the matter of my arrangements with Gwirtz-Davis.* I consider these arrangements to be my private bus-

iness, and I am anxious to keep discussion of this and all my private business out of the Courts and the newspapers.

3. *In the event that any Court should attempt to alter my contractual arrangements with Gwirtz-Davis, I intend to and will pay Gwirtz-Davis what they are entitled to under the contract out of whatever funds come into my hands from the Estate.*

4. At the time that I met with Mr. Davis, it was suggested that I should have a lawyer in Philadelphia to protect my interests. Since I knew the names of no Philadelphia lawyers, Mr. Davis gave me the name and law firm of at least three lawyers and, from that list, I selected John F. Meigs of Saul, Ewing, Remick and Saul. I have a separate compensation arrangement with Mr. Meigs, and I am satisfied that it is a reasonable arrangement. . . . (Emphasis supplied.)

Mr. Meigs read the affidavit to Mr. Allen and asked him if he would sign it. Allen replied, "Yes, send it down and I will sign it." The document was mailed to Mr. Allen, who "didn't read it too thoroughly," or "read it over very quickly," signed it "immediately," and had it notarized. Counsel initiated the telephone call. There was no conversation between Allen and John Meigs with respect to the subject matter of the affidavit before Meigs' telephone call. Allen had nothing to do with its preparation. He stated, "If it doesn't please the Court, I will go along with whatever the Court says." Mr Allen was asked by the court whether he objected to the court's inquiry into his association with Mr. Davis. He replied, "No, I don't."

When questioned with respect to the language in the affidavit: "In the event that any Court should attempt to alter my contractual arrangements with

Gwirtz-Davis, I intend to and will pay Gwirtz-Davis what they are entitled to under the contract out of whatever funds come into my hands from the Estate," Mr. Allen stated that he had not drafted the affidavit, went along with what his counsel wrote and said that *"whatever the Court wants is what I am going to do."* (Emphasis supplied.)

On February 20, 1979, at the initial hearing in this case, Herbert U. Davis testified at length and produced documents directed to establishing that Franklin A. Allen was a first cousin and sole heir of decedent. Franklin Allen also testified extensively on May 22 and May 23, 1979, as to his family, particularly his relationship to Robert Atkinson and Robert's wife, Isabelle Lillico, the parents of Harold Atkinson.[6]

Davis acknowledged that he had a contingent fee agreement with Mr. Allen for his compensation. He stated he had no agreement regarding fees with the administrator or his counsel. He testified that he first learned of Harold Atkinson's death from them and was authorized by them to go ahead and make his search and report the results at "no cost to the estate."

The unusual events and conduct revealed by the foregoing recital of the facts attending administration of Harold Atkinson's estate require appropriate treatment by the Orphans' Court which is a court with power of equity: Webb Estate, 391 Pa. 584, 586, 138 A. 2d 435 (1958). The reach of the court of equity in the circumstances in necessarily exten-

---

6. Mr. Allen had also been deposed on May 3, 1978, at Philadelphia, without leave of court, by his attorney. The administrator, his counsel, the attorney for the Commonwealth of Pennsylvania and Mr. Davis were present. The transcript of this deposition was received in evidence as Exhibit 41.

sive. Whenever a chancery court acquires jurisdiction for any purpose, it will, as a general rule, proceed to determine the entire cause. Here, the conduct of the genealogist, Mr. Davis, aided, as he appears to have been, by the administrator and his counsel, and by counsel for Mr. Allen, the putative heir, raises numerous questions for the court's disposition.

By its terms, the agreement of February 20, 1978, *assigns* to Davis an "undivided twenty-five (25%) percent" interest of Franklin Allen's distributive share in the Estate of Harold Atkinson. The orphans' court, accordingly, has the jurisdiction, power and duty to inquire into the agreement since it involves a question of distribution of a decedent's estate: Way Estate, 379 Pa. 421, 434, 109 A. 2d 164 (1954).

"Where a distributee makes a contract or deals with *his own distributive share*, the Orphans' Court has jurisdiction to pass on the validity of the contract or transfer if the distributee, expressly or impliedly, has *assigned* such distributive interest. The jurisdiction is sustained because by the assignment the distribution of decedent's estate becomes involved." (Emphasis in original.)

Webb Estate, supra, holds that the orphans' court possesses the power of a court of chancery in aid of the exercise of its jurisdiction over and above the power vested in it by statute: 391 Pa. 584, 586. Webb further instructs that the administrator is under the control and direction of the orphans' court from the grant of letters until his discharge, and stated at p. 590 "any property received by him as administrator may be regarded as in the custody of the court."

It follows that any assignments of the assets held by the administrator, as well as the actions of the administrator and those acting through or for him, are subject to the scrutiny of this court. Here, in calling Davis and "starting him on the search" without leave of court, the administrator delegated certain essential duties to the heir seeker, who, in effect, became the fiduciary's agent. Thus, any practice or impropriety on the part of an individual contacted by and working with the fiduciary, is under the court's control. See, generally, 4 Remick, O.C. Practice (Frampton Rev.) §28.04(e), 1 Hunter, O.C. Commonplace Book, Assignments §1(a).

The courts in England and in the United States have long looked with disfavor upon the evils inherent in heir hunting. This activity is conducted by heir searchers or genealogists who have learned that unknown or missing heirs may exist in an estate in process of administration, and endeavor to locate an heir or heirs by exploration of genealogical information and public records. The expectant heir, in due course, is informed that he has a claim against the unsettled estate and is promised or provided with genealogical and other essential information by which his claim may be established, on condition that he contracts with the heir hunter to agree to pay a substantial portion of his inheritance to the genealogist.

Risking a finding of unauthorized practice, champerty or solicitation, these heir hunters have constantly adapted and changed their patterns of operation in order to avoid such hazards. See: Note, "Heir hunting—A profession or a racket?" 7 Vand.L. Rev. 104 (1953); 171 A.L.R. 351; Estate of Rice, 193 N.E. 2d 566 (1963); Carey v. Thieme, 2 N. J. Super. 458, 64 A. 2d 394 (1949). As the author

of the Notes in the Vanderbilt Law Review stated at pp. 107, 110:

> The professional heir-hunters have learned to conceal these illegal practices by omitting in the formal written contract any reference to their control of the heir's claim. The courts have not been misled very often by this subterfuge, but have also looked to other facts, such as oral agreements and superior knowledge, to find any intended control of litigation.
>
> To ascertain the presence of any of these elements of champerty the courts must remain keenly aware not only of the written contract, but of the entire transaction as shown by the respective positions of the parties, the services actually contemplated and other circumstances tending to show assistance in contemplated litigation, the common element of champertous contracts. The contingent nature of the heir-hunter's compensation suggests that the genealogist intended to take all steps necessary to the heir's recovery . . ."

Here, it is to be observed, as the Supreme Court of Kansas stated in Boettcher v. Criscone, 180 Kan. 3944, 299 P. 2d 806, 811 (1956): "Whether champerty . . . is in violation of public policy cannot be determined by any one rule or statement; it turns largely on the facts and circumstances of each case."

Initially, the heir searcher was brought into the case in December, 1977, within a few days of the administrator's appointment. He was briefed on the facts and was provided with letters and documents to aid his efforts. It was agreed that he would engage in the search on his own. Further, counsel who "started him on his search," and Davis agreed that if Davis was successful, he would make appro-

priate arrangements with any heir or heirs. This was so, notwithstanding that it was the duty of the administrator to search for and locate heirs, McIlwain's Estate, 27 D. & C. 619 (1936), Onyshochenko Estate, 25 Fiduc. Rep. 63, 64 D. & C. 2d 87 (1972), and to report in writing to the court, detailing his investigation and the relevant facts: Supreme Court O.C. Rule 13.3 and Phila. O.C. Div. Rules 69.4.2 and *69.5.[7]

Obviously, the administrator, in the few days following his appointment and before delegating the search function to Mr. Davis, made no such search or report pursuant to the local rule. Rather, it appears that in the exercise of the delegation of his

---

7. Rule *69.5 provides:

"The report . . . shall be submitted at the audit, and shall include, substantially, the following: (a) Unknown Distributee. If it appears that the identity or whereabouts of a distributee is unknown, or there are no known heirs, the fiduciary shall submit a written report at the audit, verified by affidavit of the fiduciary of his counsel, in which shall be set forth (1) the nature of the investigation made to locate the heirs of the decedent, in complete detail; and (2) in cases of intestacy, or where there are no known heirs, a family tree, as complete as possible under the circumstances, supported by such documentary evidence as the fiduciary has been able to obtain.

"The term 'investigation', as used in this rule, shall include inquiry of or as to as many of the following as may be pertinent and feasible: residents of the household in which the decedent resided; friends and neighbors; labor union membership; places of employment; social, fraternal, or beneficial organizations; insurance records; church membership; school records; social security, Veterans' Administration, or military service records; naturalization records, if not native born; and such other sources of information as the circumstances may suggest."

responsibilities, the administrator, as well as counsel, started Davis on his search.[8]

Nor was introducing Davis to the case and sending him forth on his search the end of the joint efforts of the administrator, his counsel, and Davis. Counsel for the estate informed the court that Davis met with him on occasions and advised him that he was involved in an extensive investigation. Counsel referred all inquiries by possible claimants to Davis. Indeed, it is apparent that close working relations were maintained between Davis, the administrator and his counsel in the period from December, 1977 through May, 1978, when the deposition of Franklin Allen was taken at Philadelphia in the presence of the administrator, his counsel and Davis. Considering these facts, the court cannot agree that Mr. Davis was not "retained" by the administrator. Without the initial actions and continuing cooperation of the administrator and his counsel, it is doubtful that Davis would have entered the case as early as he did and been able, as promptly as he was, to identify and contact Franklin A. Allen.

Further, having been briefed on the search by the administrator and his counsel, and having been provided with relevant materials from time to time

---

8. Restatement, 2d, Trusts, §2, Comment b. "A fiduciary is normally under a duty not to delegate to a third person the performance of his duties as fiduciary." The same course of action was pursued by the same Administrator in the Estate of James E. Henderson, No. 349 of 1978 (C. P. Phila., O.C. Div.). In that matter, by letter dated November 1, 1978, the Administrator informed the Court that: "Shortly after I was appointed Aministrator of the . . . Estate I contacted Herbert U. Davis . . . and requested that he undertake a search for heirs of the decedent. . . . Thereafter I provided Mr. Davis with whatever information was available to assist his search."

during the course of his investigation, once Davis determined that Franklin A. Allen was the putative heir of Harold Atkinson, he was under a duty promptly to disclose the identity of the heir to them. The administrator and his counsel, in turn, acting pursuant to Rule *69.5,[9] were duty bound to inform the court in writing of the existence of the heir and to seek appropriate compensation from the court for the heir searcher.

Davis' conduct in failing to disclose to the administrator the existence and identity of the heir, before entering into the contingency fee agreement with the putative heir, is contrary to the demands of good faith and public policy as set forth in Supreme Court Rule 13.3 and Philadelphia Orphans' Court Rules 69.4.2 and *69.5. For Davis to have withheld the identity of the heir from the administrator and to have exploited this continuing ignorance of the administrator in order to make it possible for him to proceed to induce Allen to sign the contract of February 20, 1978, cannot be sanctioned by this court.

The Pennsylvania courts have refused to enforce contracts where there is a lack of good faith, fairness and frankness on the part of the heir hunter: McIlwain's Estate, supra. Similarly, where the courts have found champerty, they have refused enforcement of the contract's terms. Thus, in the matter of Ames v. Hillside Coal & Iron Co., 314 Pa. 267, 272, 171 Atl. 610 (1934), the court said: "While there has been some relaxation in the application of the common law doctrines of champerty and maintenance in this, as well as in other jurisdictions, champerty, repugnant to public policy, is still ground for denying the aid of the court. . . ."

---

9. See footnote No. 7.

Champerty has been defined as "the unlawful maintenance of a suit in consideration of some bargain to have a part of the thing in dispute or some profit out of (the litigation)." Frazier Estate, 75 D. & C. 577, 594 (1951). An agreement by a stranger to defray the expenses of a suit in which he has no interest or to give substantial support and aid thereto in consideration of a share of the recovery of the proceeds thereof is condemned by the court as champertous: Frazier Estate, supra; Waychoff v. Waychoff, 309 Pa. 300, 163 Atl. 670 (1932); McIlwain's Estate, supra, at 621; Champerty & Maintenance, 14 C.J.S. §§1, 722.

There can be no question that all of the expenses of the search for an heir of Harold Atkinson and of preparing and presenting evidence of kinship of Franklin A. Allen to the orphans' court, were initially to be borne by Davis, whose sole vehicle for recovery of these expenses was the agreement of February 20, 1978: that is, by Allen's grant to Davis of "an undivided twenty-five (25%) percent interest in every portion of the said property or assets to which I (Allen) may be entitled." Such a bargain to share in the proceeds contingent on the success of the litigation is illegal, if it is also part of the bargain that the party seeking to enforce the claim shall pay the expenses incident thereto: Ames v. Hillside Coal & Iron Co., supra, at 272; McIlwain's Estate, supra, at 622.

As indicated, courts of equity have sought to protect expectant heirs from sophisticated and overreaching contracting third parties. The rule has been:

". . . [I]n every such conveyance or contract with an heir, reversioner, or expectant, a presumption of invalidity arises from the transaction itself, and the

burden of proof rests upon the purchaser or other party claiming the benefit of the contract to show affirmatively its perfect fairness, and that a full and adequate consideration was paid. . . ." 3 Pomeroy, Equity Jurisprudence §953a (5th ed. 1941.)

Questionable activity by Mr. Davis continued in his meeting with Mr. and Mrs. Allen on February 20. Here, inquiry should be made as to the good faith or unconscionability of Davis' conduct, the relative position of the parties in the bargaining process, the nature of the contract, and the manner in which the contract clauses were brought to the attention of Mr. Allen.

It is clear that Davis, having knowledge that Allen appeared to be the only heir of Harold Atkinson, withheld that information from Allen until Allen signed the letter in which he agreed to assign to Davis "an undivided (sic) twenty-five (25%) percent interest" in the property to which Allen might be entitled (Trustee's Exhibit 3). Davis told Allen, when they met at the Tampa airport, that, if he did not sign the contingent fee contract, "that was it." Nonetheless, Davis waved the "six figures" at Allen, in effect saying that if Allen did not sign, he would not disclose any information. Allen understood that he would not be told the name of the person from whom he might have inherited if he did not sign.

Significant facts indicate that the relative bargaining positions of the contracting parties were grossly unequal. Allen was, on February 20, 1978, an aged, ailing and crippled man with no knowledge whatever of a possible inheritance. He was not even aware, until after the contract proffered by Davis was signed, who the decedent was. Davis,

on the other hand, knew all the facts, the parties, the procedures. He was able to entice the aged and far less sophisticated Allen by mention of the "six figures." Moreover, he was able to convince Allen that Davis would do the work necessary for him to realize the inheritance and that he would not charge Allen a penny. Davis also told Allen that if he were unsuccessful in receiving anything, it would cost him nothing; and that if successful, Davis would be "paid from the estate." Here, Davis was exploiting the ignorance of Allen and Davis' superior knowledge of what, where, who and how, in order that Davis might participate substantially in the estate of Harold Atkinson.

Davis said he was "willing to *represent* you (Allen) if you want me to, and I will make a contract with you. If you are willing to sign a contract, I will do this work for you and I *won't charge you one penny,* but if I do, then I *get paid so much from the estate.*" (Emphasis supplied). It should be noted that in this extract from the conversation, as related by Mrs. Allen, Davis talked in terms of representation. He also made it clear to Allen that for Davis' representation, Davis would be paid from the estate.

Accepting Davis' own words, as they must have been understood by Mr. and Mrs. Allen, Davis' compensation was to be paid by the estate. Davis was, of course, correct in this conclusion. As the Supreme Court stated in Webb Estate, 391 Pa. 584, 590, 138 A. 2d 435 (1958):

The administration of the estate of a decedent is one indivisible judicial proceeding, from the grant of letters appointing the administrator until his discharge. The administrator while functioning is at all times under the control and direction of the orphans' court. He is, in a sense, an officer of the court and any property received by him as adminis-

trator may be regarded as in the custody of the court.'"

The monies in this estate payable to the heir are in the custody of the court and include any portion thereof claimed by the genealogist pursuant to the written agreement of February 20, 1978, between Allen and Davis (Trustee's Exhibit 3) and regardless of that agreement.

Despite the language of the agreement, which purports to reflect Mr. Allen's addressing himself to Gwirtz-Davis, it is evident that the "letter" was a printed form, drafted by and presented to Mr. Allen by Davis. It had, of course, been carefully composed and refined to avoid the pitfalls inherent in such letters of heir hunters and to circumvent the protection of heirs traditionally extended to them in the public interest by courts of equity. Thus, through sophisticated draftsmanship, Mr. Davis tried to avoid the difficulties encountered by his former associate, Mr. Gwirtz, in McIlwain's Estate, supra. See also Frazier Estate, supra.

In McIlwain's Estate, supra, the Philadelphia Orphans' Court found the conduct of the genealogist, Mr. Gwirtz, champertous and therefore illegal. Mr. Gwirtz had sought out three of the heirs and secured assignments and letters of attorney whereby they assigned to him as compensation for his services one-half of the share each inherited. The power of attorney authorized Mr. Gwirtz or his attorney to act on behalf of the beneficiaries in recovering and collecting the fund and gave the genealogist the exclusive right to handle the matter in its entirety. The auditing judge's refusal to award any compensation to the genealogist was affirmed by the court en banc.

Although the contract with Allen provides that the sole consideration or obligation of Davis was to "provide information and continue the investiga-

tion," the reality is that Davis undertook to establish Allen's kinship to Atkinson. Had the court not required that Allen personally appear, the heir would have relied solely on the testimony of Davis to establish his claim. This dependency on the heir hunter was an implied term of the contract and made the agreement virtually indistinguishable in substance if not form from the contract held to be champertous in McIlwain.

Davis' conduct is also unacceptable with respect to his actions in the designation of counsel for Mr. Allen. After Allen signed the letter, which painstakingly states that Davis was "not undertaking to do any legal work" for him, Davis asked Allen, "Don't you think you should have a lawyer?" When Allen answered affirmatively, Davis immediately wrote three names on a sheet of paper from which Allen was invited to "take whomever you want." Davis had selected three names from over 8,000 members of the Philadelphia Bar. Davis blessed Allen's choice of John Meigs with, "If you want him, that's all right, anyone you want."

Davis' part in the section of Allen's nominal counsel is reflected in the bizarre drafting and execution of the affidavit of April 16, 1979.

Franklin A. Allen's testimony unequivocally established that the affidavit was not drafted in his interest or at his request. It was not even discussed with Mr. Allen until after it was prepared and ready for his signature. On its face, the affidavit would serve only the interest of Mr. Davis to the prejudice of Mr. Allen. Nonetheless, Mr. Meigs, after drafting the affidavit, phoned Mr. Allen in Florida, read the affidavit to him and solicited his signature.

It is not surprising that Mr. Meigs' senior associate and co-counsel stated "that Mr. Allen has somewhat completely disavowed the affidavit," apologized for it and requested permission to with-

draw it. But the affidavit speaks dramatically of the relationship of Davis, Allen, and Allen's counsel. This court finds that counsel's retainer was at the instance of Mr. Davis and that Mr. Meigs ambiguously, at least, represented Mr. Davis in this matter.

That Davis was in control is evident in that here and in each estate presently under review by this court in which Davis recommended counsel to the putative heir, counsel's contingent fee for legal services amounted to five percent of the recovery, although Davis' compensation ranged from 25 percent to 40 percent. See Estate of Henderson, supra; Estate of Fontaine, supra; Estate of Brooks, No. 183 of 1979 (C. P of Phila., O.C. Div). In none of these cases did Davis, before asking the possible heir to execute the contract, ask him whether he had counsel. Although Davis never undertook to pay counsel for the heir, in those estates where Davis' share was in excess of 25 percent, he reduced his own compensation by five percent where the heir accepted counsel suggested by Davis.

The primary, if not the only role of counsel for the heir was to call Mr. Davis as a witness to introduce proof of kinship.

Attorneys who are recommended by Davis obviously serve two masters. Since their own compensation hinges on the validity of the contract between Davis and putative heirs, it can scarcely be anticipated that counsel so retained would question the validity of the contract.[10]

---

10. Counsel should be mindful that ". . . especially in the civil context, it is highly desirable that lawyers be forced to think through the moral implications of the legal work that they are being asked to handle." Kaufman, Book Review, The Moral Foundations of Professional Ethics, 94 Harv. L. Rev. 1504, 1510 (1981).

Independent counsel would have examined all aspects of the agreement to insure its fairness to the client. But Allen's counsel made no effort to obtain a copy of the agreement. He stated that he was first shown the contract between his client and the genealogist by Davis in May, 1978, more than six months after he was retained, when the deposition of Mr. Allen was taken. He did not have a copy in his file.

In arguing in a manner that indicated advocacy of Davis rather than Allen, counsel treated the agreement as a fait accompli: As noted above, Mr. Davis had entered into a contract with the claimant before Mr. Meigs or this office became involved. Thus, compensation had already been agreed upon before claimant secured a lawyer and by the time counsel was retained, any question of payment on Mr. Davis' contract had already been concluded.[11]

Before calling Mr. Davis as a witness, Mr. Meigs stated that the arrangements for compensation between his client and the genealogist are a matter of contract and not really before the court. For the reasons stated herein, such an assertion is erroneous. Equally erroneous is any averment that the orphans' court lacks jurisdiction because the contract in question is between two living persons. As the court stated in Way Estate, supra; at pp. 424, 434:

"Appellant fails to distinguish between agreements executed by all parties in interest in a decedent's estate relating to its *DISTRIBUTION*, and

---

11. Memorandum of Law contra the Trustee Ad Litem's motion to strike Mr. Davis' testimony on the basis that it was contrary to the Code of Professional Responsibility: D.R. 7-109-(C).

where the dispute is between a distributee and a living person involving *no* question of distribution of a *decedent's estate*. Such latter controversy between living persons, being foreign to a *distribution* of the decedent's estate, must necessarily be relegated to the court of common pleas.

" . . .

"Where a distributee makes a contract or deals with *his own distributive share,* the Orphans' Court has jurisdiction to pass on the validity of the contract or transfer if the distributee; expressly or impliedly, has *assigned* such distributive interest. The jurisdiction is sustained because by the assignment the *distribution* of decedent's estate becomes involved. Judge Hunter in his Orphans' Court Commonplace Book, Vol. 1, p. 64, accurately states this phase of the law: 'The Orphans' Court in a proceeding to distribute an estate among legatees, next of kin and heirs, has ample power to inquire into and determine all questions standing directly in the way of a distribution to these parties.'" (Emphasis in original.)

The orphans' court clearly has the power to raise objections to an account on its own motion: Thompson Estate, 426 Pa. 270, 232 A. 2d 625 (1967). Thompson holds the mandate of section 711.2006, The Fiduciaries Act (now , section 3511 of the Pennsylvania Probate, Estates and Fiduciaries Code, 20 Pa.C.S.A. §3511) that fiduciaries' accounts "shall be examined and audited by the Court" gives the court the power to raise objections to an account, even though the parties in interest are satisfied with it.

Although the contract between Davis and Allen does not appear in the account or the statement of proposed distribution, its terms and method of

execution are of record. Moreover, the assignment should have been set forth in the statement of proposed distribution. In reply to (k) of the statement which reads "No share has been assigned or attached, except (if none, state "no exceptions"), the administrator stated "No exceptions."

With the existing record, this court would be remiss if it did not question the contract which includes the assignment. Can it be anticipated that prospective heirs whom Davis finds and with whom he negotiates would raise objections? Most have lost contact with the deceased relative, if indeed they ever knew him or her at all. Virtually all are "laughing heirs" who consider these inheritances windfalls.[12] In the instant case, the Atkinson and Allen families were estranged. Harold Atkinson was alienated from, if not hostile to, his father's family and his father who deserted him and his mother when he was a youth. Allen was age 9 and Atkinson 14 when they last saw each other in 1914, although Allen lived in the Philadelphia area until 1968. Lillian Allen, Franklin Allen's widow, a total stranger to decedent and sole heir under Mr. Allen's will, will now inherit the entire estate.

Traditionally, the orphans' court is a court of protection. Consequently, even in ex parte proceedings, it is incumbent upon the court to look into all aspects of assignments affecting inheritances. This is the court's duty whether the heirs be closely or remotely related, initimate with or unknown to decedent.

In a class action in which the trial court sua sponte questioned and reduced counsel fees where no members of the class had objected to the fees,

---

12. See Henderson and Fontaine Estates, supra.

the United States Court of Appeals for the Third Circuit approved the practice, saying:

"Because contingency fee agreements are of special concern to the courts and are not to be enforced on the same basis as are ordinary commercial contracts, Spilker v. Hankin, 88 U.S. App. D.C. 206, 210, 188 F. 2d 35, 39 (1951), courts have the power to monitor such contracts either through rulemaking or on an ad hoc basis." Dunn v. H. K. Porter Co., Inc., 602 F. 2d 1105, 1108 (1979).[13]

Principles and guidelines respecting contingent fee agreements for attorneys should be applicable to and even more compelling in estate matters involving contracts with fiduciaries and those working through or with them. The Orphans' Court, which is the "keeper of the Queen's conscience," has an inherent power, in the interest of justice,

---

13. Canon 13 of the Canons of Professional Ethics promulgated by the American Bar Association, provides that contingent fee agreements are subject to the "supervision of the courts as to (their) reasonableness." Federal courts have held that in their supervisory power over the members of its Bar, they have jurisdiction of certain activities of their members, including the charges of contingent fees. Consequently, "power flowing from this source has been exercised more frequently to protect those unable to bargain equally with their attorneys and who, as a result, are especially vulnerable to overreaching . . . However, it has also been exercised whenever a contingent fee agreement yields an unreasonable fee." In re Michaelson, 511 F. 2d 882, 888 (9th Cir. 1975), cert. denied, 421 U.S. 978, 95 Ct. 1979, 44 L. Ed 2d 469 (1975) (court has inherent power to examine amount charged by attorney in order to protect client from excessive fees): Farmington Dowel Products Co. v. Forster Mfg. Co., 421 F. 2d 61, 87 (1st Cir. 1969) ("court has power to examine contingent fee contract in order to assure that it is not unwittingly an accessory to excessive fee"). Dunn at 1109.

"even to protect parties [having an interest in an estate] from the effect of their own mistakes and blunders." See 5 Hunter, O.C. Commonplace Book, Review §1(b).

Society increasingly demands that we bring moral and ethical values into the making and administration of law and the court and the legal profession are responding.[14] No legal argument, no matter how expertly crafted or cogent, has persuaded us that the practices of the heir hunter, the fiduciary and his counsel, and counsel for the heir in this case can be overlooked, indulged, or approved by this court.

We find impropriety in Mr. Davis' role as the key figure who utilized his position as heir hunter to solicit the client, to promote the employment of counsel to represent him, to assume controlling influence in the litigation, to testify in furtherance of the individual represented by him and to create the scheme and letter contract for sharing in the estate of Harold Atkinson. It is conduct reflecting dissemblance and a lack of fairness and frankness in dealing with the putative heir. It reflects, moreover, self-seeking and profiteering on the part of the heir hunter, and is contrary to the policy of probate courts to "protect beneficiaries of estates from imposition or unnecessary expense." In re Lynch's Estate, 154 Misc. 260, 264, 276 N.Y.S. 939, 943 (1935); Verrall Estate, 25 D. & C. 2d 692, 12 Fiduc. Rep. 129, 132, 133 (1961).

Such a course of conduct has been held to be contrary to public policy in other states, and is equally unacceptable to this court: In re Lynch's Estate, supra; Estate of Butler, 29 Ca. 2d 644, 177

---

14. See *Ethics Makes a Comeback. Teaching Morality.* Michael Walzer: The New Republic *July 10, 1978: Conflicts of Interest in the Legal Profession*, 94 Harv. L. Rev. 1244 (1981).

P. 2d 16 (1947); McIlwain's Estate, supra; Frazier Estate, supra.[15]

---

15. Many of the pitfalls here present might have been avoided had there been proper instructions to and supervision of the administrator. In prior practice in decedent's estates where there were no known heirs, the Commonwealth would designate a person who applied for Letters as its nominee. Copies of the letter of designation were sent to the register of wills and to the local assistant attorney general. The assistant attorney general would promptly communicate with the administrator and his counsel, advising them of the procedures of administration and enclosing a copy of local Rules 69.4 and *69.5. The assistant attorney general would monitor the case and receive frequent reports from the personal representative. Sometime during the last decade, this practice was abandoned.

There has been long standing dispute between various Registers of Wills and the Secretary of the Department of Revenue as to who should have the appointing power. See Springer Estate, 5 Fiduc. Rep. 528 (1955); Yakowicz v. Costigan, 17 Pa. Commonwealth Ct. 287, 331 A. 2d 238 (1975); In re Costigan, 26 Fiduc. Rep. 126 (1976): Fiduc. Rev., page 1, November 1975.

The court, in Yakowicz v. Costigan, candidly notes . . . "that what is really at issue in this case is patronage. In other words, both parties quite frankly admit that the end result of the administration of any decedent dying without heirs will be exactly the same whether the Secretary or the Register appoints the administrator and counsel, but each of the parties wishes to control who gets the sometimes lucrative appointments. 17 Pa. Commonwealth Ct. at 289, 331 A. 2d at 240. Whether the administrator is designated by the Commonwealth or the Register, it seems imperative that these cases be properly supervised by the Commonwealth. Under the practice existing when this decedent died, the Commonwealth had minimal contact with the administrator until an heir attempted to prove kinship. According to Mr. Block, who represented the Commonwealth here, there were over 300 open files in Philadelphia County in 1979 and "less than one-tenth was over $20,000" (sic). Mr. Block encountered Mr. Davis in approximately 24 cases a year. It may be inferred that the small cases drag on, may not be properly administered, or may be dissipated without awards to the heirs or the Commonwealth

This court will not accept the agreement or enforce it as an assignment. Nevertheless, the court recognizes that Mr. Davis expertly compiled and presented extensive evidence tending to establish that Franklin A. Allen was the sole surviving heir of Harold Atkinson entitled to inherit under the intestate laws. Substantial services were rendered to the administrator and to the estate. In view of Davis' frequent appearances before the orphans' court divisions of the Courts of Common Pleas of Pennsylvania, it would be hypocritical to adopt now the conclusion of McIlwain's Estate, supra, and deprive him of any remuneration.

However, the compensation to Davis, pursuant to the contingent fee agreement, appears to be unreasonable, if not unconscionable.[16] The account is stated to November, 1980, and since additional income has accrued, a sum in excess of $800,000, less

as statutory heir. Neither the Register of Wills nor the office of the Attorney General were able to furnish the Court with a list of estates where there were no known heirs in which the Register had appointed the administrator.

Both the encumbent Register of Wills and the Regional Office of the Attorney General have been alerted by the court to the deficiencies in these practices, and the court has been assured that remedial measures have been or will be implemented.

The monies presently on hand, which have been paid to the Clerk of the Court in Philadelphia, have totalled more than $1,400,000 over the past seven years. The money is principally from estates in which heirs have not been located. Since much of this fund will ultimately go to the Commonwealth, it would appear that the Commonwealth should make concerted efforts toward seeking heirs, and supervise the administration of these estates.

16. The test for unconscionability is "absence of a meaningful choice on the part of one party, as well as unreasonably favorable terms to the other party." See Neves v. Riley, 447 F. Supp. 306 (D. & C. 1978).

Federal estate taxes, counsel and fiduciary fees, will be available for distribution, from which, pursuant to his agreement, Mr. Davis might claim 25 percent. Considering the contributions of counsel, the administrator, newspaper reporters from Coatesville, the first cousins once removed of Mr. Atkinson, all of whom undoubtedly helped Davis locate Allen, and the efforts of Mr. Allen himself in furnishing family bibles and various documents, the work of Mr. Davis in less than two months before he "signed up" Mr. Allen may not merit such compensation.

In In Re Simmons' Estate, 31 Cal. Repr. 861, 217 C.A. 2d 580 (1963), it was held that not only the sufficiency of the consideration, but also the circumstances surrounding the execution of the instrument may be examined by the court in order to determine the validity of the assignment. The standard by Simmon's Estate to determine the reasonableness of the consideration is the value of the property involved compared with the value of the alleged consideration.

California, which never adopted the common law doctrine of champerty and maintenance, has a statute originally enacted in order to control the abuses of heir hunting. Its courts may investigate the reasonableness of an assignment on the motion of an interested party or the public administrator, or on its own motion: Cal. Prob. Code Ann. §1020.1 (1944). New York has a similar statute: N.Y. Stat.: Surr. Ct. Proc. Act §2112.[17] However, irrespective

---

17. In addition to New York and California, at least twenty-five other states have some statutory provision for a public administrator. Many of the problems presented in the administration of this estate and the companion cases cited could have been avoided had a public administrator immediately taken over the supervision of the estates. This subject might well be considered by the Legislature.

of the statutory discretionary power to determine the reasonableness of an assignment, a California Court has held that it may declare the contract between heir and heir hunter to be void as against public policy if it finds the consideration for the contract insufficient: In Re Estate of Collins, 73 Cal. Rptr. 599, 268 C.A. 2d 86 (1968).

Shortly after the arrangements between Davis and the heir were questioned at the hearings, counsel for Herbert U. Davis and Davis submitted certain proposals to the administrative judge and other Judges of the Orphans' Court Division of Philadelphia respecting compensation to Davis in estates where an heir was missing or an individual died without known heirs. The judges of this court submitted to Davis' counsel the following proposed form to be used in the future cases involving possible escheat.

AND NOW . . . upon consideration of the annexed petition, leave is granted to _____, Administrator of the estate of _____, to retain the services of Herbert U. Davis, Genealogist, for the purpose of conducting an investigation to ascertain whether _____ was survived by next of kin entitled to share in his estate under the Intestate Act. The request for approval of the proposed compensation in advance to Mr. Davis is denied at this time without prejudice. The question of the amount of Mr. Davis' compsensation will be determined by the Auditing Judge.

This procedure will now be applied. Before an award can be made to the ancillary administrator of the estate of Franklin A. Allen, the reasonable value of Mr. Davis' services under the circumstances of this case must be determined. A hearing for that purpose will be held at a time selected by counsel and the court.

Because of occasional representations by decedent that he was married, and documents found among his effects including a 1956 income tax return in the names of Harry and Mary Barnes, and a railroad pass in the name of Mary Barnes, the court requested further investigation as to whether decedent was ever married or had issue. (See audit memorandum dated September 25, 1979.) With leave of court, the services of James Benjamin were engaged, and he, together with the administrator, made an exhaustive investigation. It was ascertained that decedent did indeed have a relationship with a woman to whom he referred as Mary Barnes. It was clear, however, that Mr. Atkinson never married Mary (Hill) Barnes and that no issue were ever born of that relationship.

In December, 1980, the court received a letter from counsel for Edwin F. Lochner, a "Certified Genealogist," who had independently started an investigation for heirs of Harold Atkinson. Mr. Lochner questioned, inter alia, whether decedent's father, Robert F. Atkinson, was in fact the uncle of Franklin A. Allen, and mentioned other possible discrepancies in the family tree. Mr. Lochner's correspondence was referred to the trustee ad litem, whose written report was submitted at the audit on June 1, 1981, and is attached to this adjudication. The trustee ad litem has concluded that the questions raised by Mr. Lochner are of little consequence, and that a finding by the court that Franklin A. Allen was the sole surviving next of kin to Harold Atkinson entitled to inherit under the Intestate Act is appropriate.

The testimony and the exhibits establish by clear, precise and definite evidence that Franklin A. Allen was decedent's first cousin. There are no other relatives entitled to inherit on Atkinson's paternal line, and there appeared to be no relatives on

the maternal line: MacCarthy Estate, 30 Fiduc. Rep. 307 (1980).

Franklin A. Allen died testate on March 19, 1980, and Letters of Administration were granted in Pinellas County, Florida, to his widow, Lillian G. Allen, on May 27, 1980. Ancillary Letters of Administration were granted to Lillian G. Allen on May 22, 1981, by the Register of Wills of Philadelphia County.

Both the administrator and his counsel rendered extraordinary services in cooperating with the United States Attorney's Office and the Strike Force in bringing to trial the individuals who had stolen decedent's assets, and in recovering those assets for the estate. At the court's direction they further assisted in the investigation for heirs and ruling out the possibility that Atkinson was survived by a spouse or issue. Additionally, there were prolonged hearings and conferences with respect to kinship and tax liability. Pursuant to the suggestion of the court, counsel and the administrator have submitted statements of services rendered, time records and requested fees.

Further explanation is in order to determine whether certain services might have been administrative or investigatory, rather than legal in nature. Consequently, a hearing will be set at which time the services will be explained and the fees justified.

Pending the hearings respecting the fees for services rendered by Messrs. Davis, Apfel, and Moore, the administrator is directed to make partial distribution in the amount of $50,000 to Lillian G. Allen, ancillary administrator of the Estate of Franklin Allen, and to pay the sum of $2,082.05 as additional fee and costs to Theodore W. Flowers, Esq., trustee ad litem. The administrator is directed to prepare and file a bring-down accounting stated to date.